Denise Carlon, ESQUIRE
KML Law Group, P.C.
216 Haddon Avenue, Ste. 406
Westmont, NJ 08108
(215) 627-1322
Attorneys for Deutsche Bank National Trust Company as Trustee for HarborView Mortgage Loan Trust Series
2007-2

| | |
|---|---|
| IN THE MATTER OF:<br><br>Paul Vincent Schaeder<br><br>DEBTOR(S), | **IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY**<br><br>CHAPTER 11<br>CASE NO. 16-24276 KCF<br><br>NOTICE OF OBJECTION |

The undersigned, Denise Carlon, Esquire For KML Law Group, P.C., attorney for Secured Creditor **Deutsche Bank National Trust Company as Trustee for HarborView Mortgage Loan Trust Series 2007-2**, the holder of a Mortgage on the debtors' premises at **20 -22 Hudson Place Weehawken, NJ 07087** hereby objects to the confirmation of the debtors' proposed Chapter 11 Plan:

1. On December 12, 2006, Karen Wojtowicz executed a note in favor of First National Bank of Arizona in the amount of $650,000. Said note was secured by a mortgage on real property known as 20-22 Hudson Place, Weehawken, NJ 07087. The mortgage was executed by Karen Wojtowicz, Paul Schaeder, and Jacqueline Schaeder. The mortgage was subsequently assigned to Deutsche Bank National Trust Company as trustee for Harborview Mortgage Loan Trust Series 2007-2. See Loan Documents, attached hereto as Exhibit A.

2. Debtor is not an obligor on the note. Furthermore, thought Debtor is a mortgagor, he is not the sole mortgagor. The mortgage was executed by two other parties who are not Debtors in this case.

3. Debtor's plan proposes to cram down the amount of the subject lien to $405,000. Debtor has yet to provide proof of value as to the subject property.

4. Secured Creditor obtained an appraisal of the subject property, which values the property at $850,000.00. The appraisal is attached hereto as Exhibit B.

5. Debtor's plan indicates that the remaining balance on the loan shall be unsecured as to the collateral. This provision gives the two non-filing mortgagors the benefit of a discharge, and prevents Secured Creditor from collecting pursuant to the loan documents from two parties who are not bound by the confirmation order.

6. Debtor's plan also indicates that escrow will only be paid by the Debtor post-confirmation, which means that the Secured Creditor will be carrying the costs of this property during the

lengthy confirmation process.  Secured Creditor should not be advancing funds post-petition, pre-confirmation on a property that Debtor claims is underwater and already seeks to cram down.

7.    Accordingly, Debtor's plan is NOT feasible, as it does not fully compensate the Movant.

In the event the debtors cure the aforesaid payments due outside the Chapter 11 Plan prior to the Confirmation Hearing, the undersigned will not appear at the Confirmation Hearing and aforesaid objections should be deemed waived.

/s/ Denise Carlon**, Esquire**

Denise Carlon, ESQUIRE

Attorney for Deutsche Bank National Trust Company as

Trustee for HarborView Mortgage Loan Trust Series 2007-2

Dated:  June 15, 2017

# Exhibit

# A

12/13/2006 WED 13:56  FAX 908 782 8551 Clear Advantage Title                                  ☑008/065

# ADJUSTABLE RATE NOTE
## 5 Year Fixed Rate Payment Option

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

| December 12, 2006 | Fairfax | VA |
|---|---|---|
| [Date] | [City] | [State] |

20-22 HUDSON PLACE, WEEHAWKEN, NJ 07087
[Property Address]

## 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $650,000.00 (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is First National Bank of Arizona . I will make all payments under this Note in the form of cash, check, or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.    INTEREST

### (A)    Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 8.250 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B)    Interest Rate Change Dates

The interest rate I will pay may change on January 1, 2012, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C)    Interest Rate Limit

My interest rate will never be greater than 9.95 %.

**ORIGINAL**

5 Year Fixed Rate Payment Option Note - MTA M/S  5/06        Page 1 of 7                                    Form #4345

.12/13/2006 WED 13:56  FAX 908 782 ●551 Clear Advantage Title                        ●                    ☒009/065

**(D)    Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E)        Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding two and one-quarter percentage point(s) ( 2.250%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

**3.    PAYMENTS**

**(A)    Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on February, 2007. Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768, PHOENIX, AZ 85082-2768 or at a different place if required by the Note Holder.

**(B)    Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $2,736.93, until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.



**ORIGINAL** ✗Ɱ

12/13/2006 WED 13:56  FAX 908 782 8551 Clear Advantage Title                    ☑010/065

### (C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on 02/01/2012, and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and Interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to One Hundred Fifteen percent of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.



5 Year Fixed Rate Payment Option Note - MTA M/S  5/06



ORIGINAL

Form #4345

**(G)          Required Full Payment**

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

**(H)          Payment Options**

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

**(i)          Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

**(ii)          Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and Interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

**(iii)          15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and Interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4.          NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.          BORROWER'S RIGHT TO PREPAY          THIS SECTION IS SUPERCEDED BY ADDENDUM HERE TO AND MADE A PART THEREOF.**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

**ORIGINAL** 

12/13/2006 WED 13:56 FAX 908 782-9551 Clear Advantage Title                                    ☒012/065

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.      LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.      BORROWER'S FAILURE TO PAY AS REQUIRED

(A)     Late Charges for Overdue Payments

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

(B)     Default

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

(C)     Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)     No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)     Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.



ORIGINAL        𝒦W

5 Year Fixed Rate Payment Option Note - MTA M/S   5/06          Page 5 of 7                        Form #4345

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.



ORIGINAL

5 Year Fixed Rate Payment Option Note - MTA M/S   5/06          Page 6 of 7                              Form #4345

.12/13/2006 WED 13:57  FAX 908 782 8551 Clear Advantage Title                                      ☐014/065

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____                    14/12/06 (Seal)
KAREN WOJTOWICZ                                        Date

_____                    _____ (Seal)
                                                       Date

_____                    _____ (Seal)
                                                       Date

_____                    _____ (Seal)
                                                       Date

_____                    _____ (Seal)
                                                       Date

_____                    _____ (Seal)
                                                       Date

_____                    _____ (Seal)
                                                       Date

_____                    _____ (Seal)
                                                       Date

# ORIGINAL                                             *[Sign Original Only]*

Return To:
First National Bank of
Arizona
P.O. Box 66604
Phoenix, AZ 85082

CLEAR ADVANTAGE TITLE, INC
1670 WHITEHORSE
HAMILTON SQUARE ROAD
HAMILTON, NJ 08690

Prepared By:

Alaina Schrager

000033508          01/25/2007 11:48A
RECEIVED          WILLIE L. FLOOD
AND             HUDSON COUNTY
RECORDED        REGISTER OF DEEDS
MTG              Receipt No. 368736

──────────── [Space Above This Line For Recording Data] ────────────

# MORTGAGE

MIN ▓▓▓▓▓▓▓▓▓▓

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 12, 2006 together with all Riders to this document.

(B) "Borrower" is Paul V Schaeder and Jacqueline M. H. Schaeder and Karen Wojtowicz

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3031 1/01

VMP ®-6A(NJ) (0005).02

Page 1 of 16      Initials:

VMP MORTGAGE FORMS - (800)521-7291

BK=15395    PG=00097

0000833502
RECEIVED
AND
RECORDED
in

01/25/2007 13:51:14
WILLIE L. FLOOD
HUDSON COUNTY
REGISTER OF DEEDS
Receipt No.:

# THE TALON GROUP, A DIVISION OF FIRST AMERICAN TITLE INSURANCE COMPANY

## TITLE INSURANCE COMMITMENT

File Number ███████

### SCHEDULE A
### LEGAL DESCRIPTION

**All that certain Lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the** Township of Weehawken, County of Hudson State of New Jersey:

BEGINNING AT A POINT IN THE NORTHEASTERLY LINE OF HUDSON PLACE, SAID POINT BEING DISTANT NORTHWESTERLY 224.11 FEET FROM THE INTERSECTION OF THE NORTHEASTERLY LINE OF HUDSON PLACE WITH THE NORTHWESTERLY LINE OF KENNEDY (FORMERLY HUDSON) BOULEVARD EAST, AND RUNNING THENCE

1. ALONG SAID NORTHEASTERLY LINE OF HUDSON PLACE, NORTH 49 DEGREES 30 MINUTES 00 SECONDS WEST, 37.50 FEET TO A POINT; THENCE

2. NORTH 40 DEGREES 30 MINUTES 00 SECONDS EAST, 100.00 FEET TO A POINT; THENCE

3. SOUTH 49 DEGREES 30 MINUTES 00 SECONDS EAST, 37.50 FEET TO A POINT; THENCE

4. SOUTH 40 DEGREES 30 MINUTES 00 SECONDS WEST, 100.00 FEET TO A POINT IN THE NORTHEASTERLY LINE OF HUDSON PLACE AND THE POINT AND PLACE OF BEGINNING.

**NOTE: Being Lot(s) 5, Block 49, Tax Map of the Township of Weehawken, County of Hudson.**

**NOTE : Lot and Block shown for informational purposes only.**

BK=15395    PG=00098

(D) "Lender" is First National Bank of Arizona

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of United States of America
Lender's address is 1665 W. Alameda Drive, Tempe, AZ  85282

(E) "Note" means the promissory note signed by Borrower and dated December 12, 2006
The Note states that Borrower owes Lender six hundred fifty thousand and 00/100
Dollars
(U.S. $650,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than January 1, 2037            .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [x] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
COUNTY                          of                          Hudson                          :
    [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]
See attached legal description

Property Account Number: Blk 49 Lot 5                          which currently has the address of
20-22 HUDSON PLACE                                                                    [Street]
WEEHAWKEN                                          [City], New Jersey 07087          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6A(NJ) (0005).02                          Page 3 of 15                          Initials: [signature]                          Form 3031 1/01

BK:15395    PG:00100

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(NJ) (0005).02                          Page 5 of 15                          Form 3031 1/01

BK:15395  PG:00102

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



-6A(NJ) (0005).02                     Page 6 of 15                     Initials: [signature]                     Form 3031 1/01

BK:15395  PG:00103

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(NJ) (0005).02          Page 7 of 15          Form 3031 1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.



-6A(NJ) (0005).02

Page 8 of 15

Initials: _____

Form 3031 1/01

BK 11 05395 PG 00100

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



BK 15395  PG 00106

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

BK:15395 PG:00107



-6A(NJ) (0005).02

Page 10 of 15

Initials

Form 3031 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the



Initials: 

-6A(NJ) (0005).02                    Page 11 of 18                    Form 3031 1/01

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

BK:15395 PG:001109



-6A(NJ) (0005).02

Page 12 of 15

Initials

Form 3031 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). **The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law.** If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BK:15395

PG:00110



-6A(NJ) (0005).02

Initials: _____

Form 3031 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

**JAMES BOGGESS**
**NOTARY PUBLIC OF NEW JERSEY**
My Commission Expires September 24, 2008

_____

_____ (Seal)
                                -Borrower
**KAREN WOJTOWICZ**

_____ (Seal)
                                -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                      -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                      -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                      -Borrower
**Paul V Schaeder**                              JACQUELINE M. H
                                                  SchaedeR

BK=15395   PG=00111

VMP-6A(NJ) (0005).02          Page 14 of 16          Form 3031 1/01

**STATE OF NEW JERSEY,** _Hudson_ County ss:

On this _12th_ day of _December_ _2006_, before me, the subscriber, personally appeared **KAREN WOJTOWICZ & Paul V Schaeder** _AND_

_JACQUELINE M.H. Schaeder_

who, I am satisfied, is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein expressed.

_____
Notary Public

**JAMES BOGGESS**
**NOTARY PUBLIC OF NEW JERSEY**
My Commission Expires September 24, 2008

BK=15395  PG=00112

Hudson County Register 20090714020026530 Bk: 1172 Pg: 797 1/1



```
20090714020026530      1/1
07/14/2009 11:34:01 AM  ASSIGNMENT
Bk: 1172 Pg: 797
Willie L.Flood
Hudson County, Register of Deeds
Receipt No. 124312
```

Recording Requested By:
AURORA LOAN SERVICES

When Recorded Return To:

Susan Lindhorst
AURORA LOAN SERVICES
P.O. Box 1706
Scottsbluff, NE 69363-1706

FC reprint

## CORPORATE ASSIGNMENT OF MORTGAGE

Hudson, New Jersey
SELLER'S SERVICING #: ▮▮▮▮▮▮▮▮WOJTOWICZ"
OLD SERVICING #: ▮▮▮▮▮▮

MERS ▮▮▮▮▮▮▮▮ VRU #: 1-888-679-6377

Date of Assignment: April 16th, 2009
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST NATIONAL
BANK OF ARIZONA IT'S SUCCESSORS AND ASSIGNS at 3300 S.W. 34TH AVENUE, SUITE 101, OCALA, FL
34474
Assignee: AURORA LOAN SERVICES LLC at 2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361

Executed By: PAUL V SCHAEDER AND JACQUELINE M. H. SCHAEDER AND KAREN WOJTOWICZ To:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST NATIONAL BANK OF
ARIZONA
Date of Mortgage: 12/12/2006 Recorded: 01/25/2007 in Book/Reel/Liber: 15395 Page/Folio: 00097 as Instrument
No.: 000033508 In Hudson, New Jersey

Property Address: 20-22 HUDSON PLACE, WEEHAWKEN, NJ 07087

  KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN AND NO/100ths DOLLARS and
other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is
hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage
together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of
$650,000.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due
or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein
contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial
interest under the Mortgage.

  TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever,
subject to the terms contained in said Mortgage and Note.

  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST NATIONAL BANK OF
ARIZONA IT'S SUCCESSORS AND ASSIGNS
On April 16th, 2009

By: _Regina Garcia_
REGINA GARCIA, Vice-President

*(SEAL 1995 — MORTGAGE ELECTRONIC REGISTRATION SYSTEMS CORPORATE SEAL DELAWARE)*

STATE OF Nebraska
COUNTY OF Scotts Bluff

ON April 16th, 2009, before me, JOANN REIN, a Notary Public in and for the County of Scotts Bluff County, State of
Nebraska, personally appeared REGINA GARCIA, Vice-President, personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

_JoAnn Rein_
JOANN REIN
Notary Expires: 12/27/2012

*(GENERAL NOTARY - State of Nebraska — JOANN REIN — My Comm. Exp. Dec. 27, 2012)*

(This area for notarial seal)

```
FILED
20090714020026530
07/14/2009  11:34:01 AM
ASSIGNMENT
NUMBER OF PAGES : 1
KSLOAN
```

When Recorded Return To:
Nationstar Mortgage LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

**Hudson County Register 20150508020014120 Bk: 1216 Pg:377**
**1/1**
**05/08/2015 09:17:47 AM ASSIGNMENT**
**Pamela E. Gardner**
**Hudson County, Register of Deeds**
**Receipt No. 1013786**

## ASSIGNMENT OF MORTGAGE

**Regarding this instrument, contact Nationstar Mortgage, LLC, 4000 Horizon Way, Irving, TX 75063, telephone # 972-956-6320, which is responsible for receiving payments.**

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **AURORA LOAN SERVICES LLC, WHOSE ADDRESS IS 4000 HORIZON WAY, IRVING, TX, 75063, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR HARBORVIEW MORTGAGE LOAN TRUST MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-2, WHOSE ADDRESS IS C/O 4000 HORIZON WAY, IRVING, TX 75063, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage in the amount of $650,000.00, dated on 12/12/2006, made by **PAUL V SCHAEDER AND JACQUELINE M. H SCHAEDER AND KAREN WOJTOWICZ** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR FIRST NATIONAL BANK OF ARIZONA, ITS SUCCESSORS AND ASSIGNS,** and recorded on 01/25/2007, in Mortgage **Book 15395, Page 00097 and Instrument # 000033508,** in the office of the Register of Titles and County Recorder in **HUDSON** County, **New Jersey.**

Property is commonly known as: 20-22 HUDSON PLACE WEEHAWKEN TWP
                                WEEHAWKEN, NJ 07087.

**Dated this 07th day of May in the year 2015.**
**AURORA LOAN SERVICES LLC, by NATIONSTAR MORTGAGE LLC, its Attorney-in-Fact (POA RECORDED: 09/23/2013 BK: 8933 PG: 886 INSTR#: 20130923010085350)**

*Ɑ Wilia*

**ALYSSA WILLIAMS**
**Vice President of Loan Documentation**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA    COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on this 07th day of May in the year 2015, by Alyssa Williams as Vice President of Loan Documentation of NATIONSTAR MORTGAGE LLC as Attorney-in-Fact for AURORA LOAN SERVICES LLC, who, as such Vice President of Loan Documentation being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

*Nicole Bal*

**NICOLE BALDWIN**
**COMM EXPIRES: 08/05/2016**

```
Nicole Baldwin
Notary Public State of Florida
My Commission # EE 222285
Expires August 5, 2016
```

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**

FIL
20150508020014120
05/08/2015 09:17:47 AM
NUMBER OF PAGES : 1
JCHAMBERS

# Exhibit

# B



420 Rouser Rd Coraopolis PA 15108 https://www.xome.com

# Desktop Valuation w/Inspection™

### Restricted Appraisal Report

| Client Information | | | | | | |
|---|---|---|---|---|---|---|
| Client | XOMEVALUATIONS | | Order Date | 02/07/2017 | Inspection Date | 02/08/2017 |
| File Number | 51148942 | | Client Ref ID | 597942705 | | |

| Subject Property Data | | | | |
|---|---|---|---|---|
| Property Type Building | Multi Family Dwelling (2-4 Unit) | Property Location | Urban | |
| Address | 20-22 HUDSON PL | City | WEEHAWKEN | State NJ  Zip  07086 |

| Value | |
|---|---|
| Market Value | Effective Date |
| **$850,000** | **02/09/2017** |

| Property Condition |
|---|
| The Subject Property is in **Equal** condition compared to the neighborhood. |
| The Subject Property is observed to be in **Average** condition. |

| Subject Property |
|---|



# Desktop**Valuation**w/**Inspection**™

### Restricted Appraisal Report

File Number        51148942
Client Reference ID    597942705

## Client Information

| | |
|---|---|
| Client | XOMEVALUATIONS |
| Branch | NATIONSTAR CREDIT RISK FORWARD | Client Ref ID | 597942705 |

## Subject Property Data

| | | | | | |
|---|---|---|---|---|---|
| Borrower | NA | Owner of Record | SCHAEDER, PAUL V & JACQUELINE M H | CurrentUse | Multi-Family |
| Address | 20-22 HUDSON PL | Property Type | Multi Family Dwelling (2-4 Unit) | Attached/Detached | Detached |
| | | Building | | | |
| City | WEEHAWKEN | Subject Location | Urban | # of Units | I |
| State | NJ | # Prop for sale on street | I | Property Interest Appraised | Fee Simple |
| Zip | 07086 | APN | 11-00049-0000-00005-- | # of properties sold in the last 3 months | 0 |
| Area Price Trend | STABLE | Highest and Best Use: Residential | | Zoning | Residential |

## Comparable Sales Data

| | Address | Type | Sale Price | Date | Dist-(mi) | Site (ac) | Age | Bed | Bath (F\|H) | GLA | Bsmt | Pool | Sale Type | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sub | 20 HUDSON PL 22 | MFD | | | 0 | 0.08 | 1935 | 3 | 2 \| 0 | 3,200 | No | No | Unknown | Public Records |
| 1 | 22 49TH ST # 24 | MFD | $850,000 | 10/27/2016 | 0.49 | 0.12 | 1930 | 4 | 4 \| 0 | 3,200 | No | No | Arms Length | MLS/Public Records |
| 2 | 117 SHIPPEN ST | MFD | $849,000 | 10/03/2016 | 0.72 | 0.10 | 1940 | 6 | 4 \| 0 | 3,247 | No | No | Arms Length | Public Records |
| 3 | 321 37TH ST | MFD | $990,000 | 06/14/2016 | 0.48 | 0.03 | 2008 | 9 | 6 \| 0 | 4,000 | No | No | Arms Length | Public Records |

## Comparable Sales Analysis

| | Subject | Sale 1 | | Sale 2 | | Sale 3 | |
|---|---|---|---|---|---|---|---|
| Street Address | 20 HUDSON PL 22 | 22 49TH ST # 24 | | 117 SHIPPEN ST | | 321 37TH ST | |
| City | WEEHAWKEN | WEEHAWKEN | | WEEHAWKEN | | UNION CITY | |
| State/Zip | NJ 07086 | NJ 07086 | | NJ 07086 | | NJ 07087 | |
| Data Source | Public Records | MLS/Public Records | | Public Records | | Public Records | |
| Sale Price | | $850,000 | 0 | $849,000 | 0 | $990,000 | 0 |
| Sale Date | | 10/27/2016 | 0 | 10/03/2016 | 0 | 06/14/2016 | 0 |
| Distance (mi) | N/A | 0.49 | 0 | 0.72 | 0 | 0.48 | 0 |
| Site Size (acres) | 0.08 | 0.12 | 0 | 0.10 | 0 | 0.03 | 0 |
| Age (Years) | 82 | 87 | 0 | 77 | 0 | 9 | 0 |
| Bedrooms | 3 | 4 | -4000 | 6 | -12000 | 9 | -12000 |
| Baths (F\|H) | 2 \| 0 | 4 \| 0 | -12000 | 4 \| 0 | -12000 | 6 \| 0 | -24000 |
| Living Area (s.f.) | 3,200 | 3,200 | 0 | 3,247 | 0 | 4,000 | -60000 |
| Basement | No | No | 0 | No | 0 | No | 0 |
| Pool | No | No | 0 | No | 0 | No | 0 |
| Garage | No Garage | No Garage | 0 | No Garage | 0 | No Garage | 0 |
| Other | | | 0 | | 0 | | 0 |
| Other | | | 0 | | 0 | | 0 |
| Other | | | 0 | | 0 | | 0 |
| Adjusted Values | Net Adj (%) | -1.9 | 834000 | -2.8 | 825000 | -9.7 | 894000 |
| | Gross Adj (%) | 1.9 | | 2.8 | | 9.7 | |

## Current Listing Information

| Subject currently listed? | No | DOM | | MLS# | | Listing Date | | Listing Price | |
|---|---|---|---|---|---|---|---|---|---|
| Listed in last 12 mos.? | No | | | | | | | | |

## Subject 3 Year Transaction History

No sales available

## Analysis of Prior Sales

No sale noted in the past 3 years

## Appraiser Reconciliation

This report reflects a 90-120 day marketing time perspective. The subject's "as repaired" value is estimated to be: $850,000. The subject is a Two Family dwelling located in Weehawken NJ. It is situated on a residential street with no adverse external influences noted, per aerial photo. All necessary supporting facilities can be found nearby. Overhead utility lines are common for the market area, and do not have any impact on marketability or value. Exterior appears to be maintained. No deferred maintenance is noted, per photo. Based upon MLS and online research the subject is not found to have been listed in the past 12 months. New Jersey public records are limited and different data sources may provide conflicting information. Available data sources do not include living area for sale #1 and it was necessary to provide a reasonable estimate. The estimate is commensurate with what is typical for housing of the subject's type in this location. DV comparable #3 exceeds a sale date of 6

# Desktop**Valuation**w/Inspection™
### Restricted Appraisal Report

File Number     51148942
Client Reference ID     597942705

months and bedroom count could not be bracketed at this time due to limited relevant comparable sales. Primary consideration is given DV comp #1 as most recent. Current and prior report completed in 10/2016 are consistent.

Based on this desktop analysis, our Opinion of Value for the subject property is:     **$850,000**

| Effective Date of Appraisal: | **02/09/2017** | Date Of Report: | **2/9/2017** |
|---|---|---|---|
| Exposure Time: | **90-120 days** | Marketing Time: | **90-120 days** |

## Prior Services Disclosure

I have (__) / have not ( **X** ) performed a service for the subject property in the past 3 years

**Services Provided:**

N/A

## Subject Property Observations (Source: Property Condition Report)

| | | | | | |
|---|---|---|---|---|---|
| In Gated Community | No | Appears habitable | Yes | Broken windows\doors | No |
| Property Maintenance | Average | Appears occupied | Yes | Evidence of roof damage | No |
| Conforms to Neighborhood | Yes | For Sale Sign | No | Evidence of structural damage | No |
| Condition compared to Neigh | Equal | Bank owned Sale | N/A | Evidence of Siding damage | No |
| Garage | No | Construction in progress | No | Evidence of fire damage | No |
| Garage Condition | | Safety Concerns | No | Evidence of water damage | No |

## Neighborhood Observations

| | | | | | |
|---|---|---|---|---|---|
| Overhead Power lines | No | Freeway/Highway | No | Railroad tracks | No |
| Commercial Uses | No | Airport/Flight path | No | | |
| Boarded up homes | No | Waste management facility | No | | |

## Comparable Location Map



This map can be viewed interactively by clicking **here**.

Copy

# Desktop**Valuation**w/Inspection™

### Restricted Appraisal Report

File Number            51148942
Client Reference ID    597942705

**Subject Property Satellite Image**



**Primary Picture of Subject**



The exterior condition of the subject property, based on this photograph, has been considered in the overall analysis by the ServiceLink appraiser. No other subject attributes are confirmed/denied, unless obvious to the reviewer as a result of this photograph.

# Desktop Valuation w/Inspection ™

### Restricted Appraisal Report

File Number        51148942
Client Reference ID    597942705

**Picture of Subject Street View**



**Picture of Subject Street View 2**



Copy

# Desktop Valuation w/Inspection ™

### Restricted Appraisal Report

File Number          51148942
Client Reference ID  597942705

**Address Verification Image**



**Agent Signature**



# Desktop**Valuation**w/Inspection™
### Restricted Appraisal Report

| | |
|---|---|
| File Number | 51148942 |
| Client Reference ID | 597942705 |

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER CERTIFICATION

**IDENTIFICATION OF REPORT TYPE:** This appraisal is a "Restricted Appraisal Report" for the property identified on page 1 of this report. Reporting requirements have therefore been completed in accordance with USPAP.

**INTENDED USER:** The client is the only intended user of this report. NO ONE OTHER THAN THE CLIENT IS AUTHORIZED TO USE THIS APPRAISAL REPORT.

**INTENDED USE:** This report is intended to be used by the identified client/user solely for internal risk assessment as it relates to the value of the subject property. No other use is intended.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and acting in what they consider their own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Source: Office of the Comptroller of the Currency, under 12CFR, Part 34, Subpart C - Appraisals, 34.42 Definitions (g).)

**SCOPE OF WORK:** The client in this appraisal report has engaged the appraiser to provide an opinion of market value. Within the context of the identified intended use, the appropriate research and analysis for credible assignment results has been determined and defined by the appraiser. **1) Inspection: The data source used for the inspection is a property condition report performed by a local real estate professional. 2) Market research:** The appraiser has relied upon data believe to be accurate, provided by public records, Multiple Listing Services and other online resources cited in the report. There is no personal property, fixtures or intangible items included in the opinion of value. **3) Approach to Value:** The appraiser has relied upon the "Sales Comparison Approach" to value, selecting similar comparable sales to demonstrate the actions of buyers and sellers in the market, in accordance with USPAP.

**ASSUMPTIONS:** The appraiser has made the following extraordinary assumptions:
1) Relevant physical characteristics for the subject and comparable properties provided by cited data sources are accurate.
2) The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed by the inspecting professional during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.
3) Unless noted otherwise within the body of this report, the appraiser is unaware of any proposed changes to the current zoning.
4) There are no easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of similar nature. Should any of these assumptions be discovered to be false, it may have a material impact on the opinion of value.

**APPRAISAL METHODS/RECONCILIATION:** The appraiser only utilized the sales comparison approach to value, as this approach most accurately reflects the activity of buyers and sellers, inherent in the definition of market value. The income approach and cost approach were not required for credible results within the context of the intended use.

**USE RESTRICTION:** This is a Restricted Appraisal Report and the rationale for how the appraiser arrived at the opinions and conclusions set forth in the report may not be understood properly without additional information in the appraiser's workfile.

**APPRAISER'S CERTIFICATION**
I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- I have not made a personal inspection of the property that is the subject of this report.
- No other appraisers provided any assistance in the development of the appraisal results. A local real estate professional, MIKA KOBAYASHI, NJ #1222046 (not an appraiser) did assist in the process by viewing the property from the street and providing the Property Condition Report, attached to this appraisal report, for the appraiser to consider in the analysis.

Copy

# Desktop**Valuation**w/Inspection™

## Restricted Appraisal Report

File Number          51148942
Client Reference ID  597942705

**Contingent and Limiting Conditions**

1. The appraiser used data that was obtained from sources deemed to be reliable. The appraiser is not responsible for any errors in information obtained from data reporting services.

2. The appraiser will not be liable for any consequential damages or lost profits, even if advised of their possibility, in connection with the report. The appraiser and ServiceLink's liability for any and all losses, damages or injuries arising out of any act or omission in connection with the report, shall be limited to the amount of the fee received by ServiceLink for such report.

Appraiser Name: MANNINO, ANTHONY A                    Signature:

Date of Appraisal/Signature Date: 2/9/2017             Title: State Certified Residential Real Estate Appraiser

License/Certification Number: 42RC00248900             State of License/Certification: NJ

License/Certification Expiration Date: 12/31/2017

Effective Date of Report: 02/09/2017

**FEE DISCLOSURE:**

The compensation for this appraisal assignment is included in the appraiser's compensation as an employee of ServiceLink, A Black Knight Company and cannot be expressed as a dollar amount. The fee retained by ServiceLink for appraisal services related to this appraisal report is **$100** less the compensation apportioned to the appraiser.

Copyright © 2014 ServiceLink, A Black Knight Company. All Rights Reserved.